**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| **QUICKEN LOANS INC.** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **RE/MAX, LLC.** | § | |
| | § | |
| **Defendant.** | § | |

## PLAINTIFF QUICKEN LOANS INC.'S COMPLAINT

Plaintiff, Quicken Loans Inc. ("Quicken Loans"), files this Complaint against Defendant, RE/MAX, LLC ("RE/MAX" or "Franchisor"), and states:

### PARTIES

1.      Plaintiff, Quicken Loans, is a corporation that is incorporated under the laws of the State of Michigan.  Quicken Loans has its principal place of business in the State of Michigan, located at 1050 Woodward Avenue, Detroit, Michigan 48226.

2.      Defendant, RE/MAX, LLC, is a limited liability company organized under the laws of the State of Delaware.  RE/MAX has its principal place of business in the State of Colorado, located at 5075 South Syracuse Street, Denver, Colorado 80237.  RE/MAX may be served with process by serving its registered agent, Geoffery D. Lewis, located at 5075 South Syracuse Street, Denver, Colorado 80237.

### JURISDICTION AND VENUE

3.      Under 28 U.S.C. § 1332, the Court has subject matter jurisdiction because this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Quicken Loans is a citizen of the State of Michigan because it is incorporated and has its principal place of business in the State of Michigan.

5.      RE/MAX is a limited liability company and a wholly-owned subsidiary of RMCO, LLC, whose members are RE/MAX Holdings, Inc. and RIHI, Inc.  RE/MAX Holdings, Inc. is a corporation incorporated under the laws of the State of Delaware with its principal place of business located at 5075 South Syracuse Street, Denver, Colorado 80237.  RIHI, Inc. is a corporation incorporated under the laws of the State of Delaware with its principal place of business located at 5075 South Syracuse Street, Denver, Colorado 80237.  Because the citizenship of a limited liability company is determined by the citizenship of each member of the entity, RE/MAX is a citizen of the State of Delaware and the State of Colorado for purposes of diversity jurisdiction.

6.      This Court has personal jurisdiction over RE/MAX because it transacts business within the state, has committed torts within the state, has committed torts outside the state that have caused injury within the state, has availed itself of the benefits of this jurisdiction, has entered into contracts with Quicken Loans performable in this state, and has committed other acts complained of herein within the Eastern District of Michigan (the "District").

7.      Venue is proper in this District under 28 U.S.C. §1391(b)(2) because a substantial part of the events and omissions giving rise to Quicken Loans' claims occurred within the Eastern District of Michigan.

## CONDITIONS PRECEDENT

8.      All conditions precedent have been performed or have occurred.

## FACTUAL BACKGROUND

9.      RE/MAX, on the one hand, is in the business of franchising real estate brokerage services by recruiting and retaining real estate agents through the sale of a RE/MAX franchise. As detailed below, RE/MAX then attempts to leverage its network of franchisees to secure marketing arrangements and fees for itself (the franchisor) without regard to the interests of its network of agents/franchisees.  RE/MAX fails to disclose when it is acting for just the corporate franchisor and when it purports to act for the 104,000 agents it claims within its network.  As such, this dispute involves only RE/MAX/Franchisor, and none of the thousands of real estate agents/franchisees that RE/MAX erroneously claimed to represent.

10.      Quicken Loans, on the other hand, is the second largest mortgage lender in the country, the largest online mortgage lender, is ranked No. 5 on FORTUNE magazine's annual "100 Best Companies to Work For" list in 2016, and has been named among the top-30 companies on the list for 13 consecutive years.  It has helped families weather one of the most tumultuous times for home ownership in U. S. history, and has done so with distinction, earning the highest possible rating from J.D. Power and Associates for Customer Satisfaction in Primary Mortgage Origination for six straight years (from 2010 to 2015) and for Mortgage Servicing Client Satisfaction for three straight years (from 2014 to 2016).

11.      Given Quicken Loans' stellar reputation and client-centered innovation, RE/MAX approached Quicken Loans in the summer of 2015 regarding a potential marketing alliance. During that discussion, RE/MAX claimed a competing originator had developed $10 billion of business as a direct result of its marketing partnership with RE/MAX.

12.     Because RE/MAX represented there was only a narrow two-week window to discuss a potential alliance, Quicken Loans and RE/MAX quickly explored the marketing opportunities that RE/MAX presented, and based on RE/MAX's representations, Quicken Loans was led to believe that there was sufficient value in RE/MAX's proposed/abstract marketing alliance to justify the proposed price.  So the dialogue continued.

13.     Eventually, Quicken Loans and RE/MAX entered into a Strategic Marketing Alliance Agreement on July 9, 2015, which would not be effective until roughly three months later on October 15, 2015 ("the Agreement," attached at **Exhibit A**).

14.     The Agreement required RE/MAX to provide specific deliverables to Quicken Loans, namely: (a) certain web-based advertising; (b) mortgage tools advertising; (c) intranet advertising; (d) affiliate training; (e) print advertising; (f) event participation; and (g) the promotion of Quicken Loans to RE/MAX franchisees and affiliates.

15.     During this same general time frame, certain regulatory changes occurred and related federal interpretations were issued, all of which impacted the legality and viability of the Agreement.  Given the dynamic legal landscape, Quicken Loans continued to analyze how to perform under the Agreement, if at all, while complying with all governing legal standards.

16.     To this end, Quicken Loans secured a valuation from an independent third party in early September 2015, which uncovered and exposed the material overvaluation of the Agreement and determined that it was worth merely half the value that RE/MAX had claimed.

17.     When Quicken Loans disclosed to RE/MAX that the contract was overvalued and therefore impermissible under governing Federal authority, RE/MAX responded by making various representations to Quicken Loans (including representations in the form of an Excel spreadsheet dated September 22, 2015, and which RE/MAX titled a "Draft Analysis of Services

Provided by RE/MAX, LLC to Quicken Loans" (the "Spreadsheet" attached at **Exhibit B**))
relating to the value, activity levels, and scope of the marketing services to be provided by
RE/MAX.  On information and belief, RE/MAX knew that the values, activity levels and scope
of the marketing services as represented to Derek Latka (Vice President of Business
Development at Quicken Loans) and as set forth in the Spreadsheet were false (and RE/MAX
knew it had no ability to provide its marketing services at these levels) but made the
representations to justify its fee and induce Quicken Loans to continue with the marketing
alliance.

18.     By way of example, RE/MAX's misrepresentations to Quicken Loans included:
(1) misrepresenting to Mr. Latka, on September 22, 2015, that there would be 4.25 million
unique visitors per month to the remax.com homepage, which would display Quicken Loans'
logo; (2) Mike Ryan (Executive Vice President of RE/MAX) intentionally concealing
RE/MAX's inability to provide its marketing services in certain independently-owned and
operated regions when negotiating and describing web presence and internet traffic with Mr.
Latka, on September 22, 2015 and again during early October 2015, making those
representations regarding value, activity levels, and scope of its services false; (3) Mr. Ryan
falsely representing to Mr. Latka, several times, including on September 22, 2015, that Quicken
Loans's links or logos would be embedded on each property listing webpage (both desktop and
mobile-accessed websites) while concealing the fact that RE/MAX did not have the authority or
access to provide such marketing services; and (4) Mr. Ryan misrepresenting to Mr. Latka on or
about September 22, 2015 that the remax.com site generated over one million direct customer
leads to RE/MAX agents (which would include a check-box for more information regarding a
loan with Quicken Loans); yet Mr. Ryan knew, when making these false representations, that the

sites generated only a fraction of that number of leads (no more than 360,000 leads), and that many of those dramatically reduced leads are actually bogus, automated inquiries (collectively, the "Representations").

19.     These disingenuous attempts by RE/MAX to justify its fee under the Agreement were the first clear signs that the two parties presented wholly contrasting corporate cultures: RE/MAX wanted to prove it was right; Quicken Loans sought to do what was right.

20.     Before the parties ever performed under the terms of the Agreement, Quicken Loans sought an amendment in reliance on RE/MAX's Representations and in an effort to cure aspects of the Agreement that appeared to conflict with the additional regulatory interpretations that certain federal agencies provided after the parties signed the Agreement.  Accordingly, the parties entered into the First Amendment to Strategic Marketing Alliance Agreement dated November 10, 2015 (the "Amendment" attached at **Exhibit C**).

21.     Thereafter, Quicken Loans, in reliance on RE/MAX's assurance of performance consistent with the specifications detailed in (a) the Representations, (b) the modified terms of the Amendment, (c) the Agreement and (d) a valuation that reflected goods and services consistent with the fees incurred, attempted to proceed with the implementation of the Agreement, Amendment, and the Representations, including providing payment to RE/MAX of over $2.3 million dollars.

22.     Shortly after attempting to implement the terms of the Agreement, and despite Quicken Loans' efforts to address RE/MAX's questionable marketing scheme, RE/MAX failed to perform in a manner consistent with the Agreement, the Amendment, the Representations or the parties' intent.  By way of example, RE/MAX did not perform its obligations pursuant to Section 6 and Exhibit E of the Agreement, as amended, by refusing to fulfill its obligations set

forth in Exhibit E with respect to RE/MAX franchisees/agents; failing to implement on remax.com the ability for consumers to request information on pre-approval from Quicken Loans by the required deadline; failing to implement digital Quicken Loans ad placements on the RE/MAX mobile app by the required deadline; and failing to implement Quicken Loans sponsored listing videos to remax.com.  Given these failures, the Amendment failed to cure the central offending aspect of RE/MAX's marketing scheme: an overvalued price leading to RE/MAX securing marketing fees that are not reasonably related to the value of the goods or services received in return – a violation of RESPA.

23.     As soon as Quicken Loans learned that RE/MAX's Representations regarding its ability to perform were false, it sought to further revise the marketing agreement to ensure compliance with all legal standards.  Simply put, Quicken Loans has sought to do the right thing. RE/MAX, instead, has rejected any modification to the parties' marketing alliance – and has refused or neglected its obligations to cure the Agreement's shortcomings, all of which impact the legality of the Agreement and Amendment.

## CAUSES OF ACTION

### COUNT 1 - DECLARATORY JUDGMENT

24.     Quicken Loans incorporates herein by reference paragraphs 1 through 23.

25.     The parties entered into the Agreement and the Amendment.

26.     There has been a change in interpretation of law, rule or regulation that impacts the legality of the terms of the Agreement and Amendment.

27.     The change in interpretation of law, rule or regulation renders the Agreement and Amendment a contract violative of the Real Estate Settlement Practices Act.

28.     Quicken Loans seeks a declaration that, as a matter of law, the Agreement and Amendment are forbidden under prevailing, binding legal authority, and, as such, are void *ab initio*.

29.     Accordingly, Quicken Loans seeks, pursuant to Rule 57 of the Federal Rules of Civil Procedure, a declaration that it is not required to perform under an impermissible contract or provide any compensation that violates any aspect of Federal or State law.

30.     Moreover, any and all compensation that was provided is to be disgorged and returned to Quicken Loans. Quicken Loans has also been required to retain the services of Morganroth & Morganroth, PLLC and Greenberg Traurig, LLP and has agreed to pay both firms a reasonable fee.   Because this is a suit for declaratory relief, Quicken Loans is entitled to recover reasonable and necessary attorneys' fees that are equitable and just.

## COUNT 2 - FRAUDULENT INDUCEMENT

31.     Quicken Loans incorporates herein by reference paragraphs 1 through 30.

32.     RE/MAX represented that it would provide certain marketing services and deliverables to Quicken Loans as set forth in the Representations.

33.     RE/MAX's Representations were false.

34.     At the time RE/MAX provided the assurances of performance (as detailed in the Representations), RE/MAX knew those representations were false or made them recklessly.

35.     RE/MAX made the Representations to Quicken Loans with the intention that Quicken Loans would act upon those representations and enter into the Amendment.

36.     Quicken Loans acted in reliance on the Representations and entered into the Amendment.

37.     Quicken Loans suffered damages as a result of RE/MAX's acts and omissions. Quicken Loan seeks disgorgement of any and all compensation that was provided to RE/MAX, including but not limited to the payment of $2.3 million dollars plus interest.

### COUNT 3 – UNJUST ENRICHMENT

38.     Quicken Loans incorporates herein by reference paragraphs 1 through 37.

39.     At Quicken Loans expense, RE/MAX received over $2.3 million dollars.

40.     RE/MAX received these amounts for marketing services and deliverables that it promised, but failed or refused to provide, making it unjust for RE/MAX to retain the payment or receive any further payment.

41.     Quicken Loans has been damaged as a result of RE/MAX's conduct. Accordingly, Quicken Loans seeks disgorgement of any and all compensation that was provided to RE/MAX, including but not limited to the payment of $2.3 million dollars plus interest.

### COUNT 4 - PROMISSORY ESTOPPEL

42.     Quicken Loans incorporates herein by reference paragraphs 1 through 41.

43.     RE/MAX promised to provide certain quantifiable marketing services and deliverables to Quicken Loans in its Representations.

44.     RE/MAX reasonably should have expected that its Representations would induce Quicken Loans to enter into the Amendment (or to forbear from terminating the Agreement), which in fact produced reliance or forbearance of that nature.

45.     For injustice to be avoided, RE/MAX's Representations must be enforced. Quicken Loans seeks disgorgement of any and all compensation that was provided to RE/MAX, including but not limited to the payment of $2.3 million dollars plus interest.

<u>COUNT 5 - BREACH OF CONTRACT (IN THE ALTERNATIVE)</u>

46.     Quicken Loans incorporates herein by reference paragraphs 1 through 23.

47.     Quicken Loans and RE/MAX entered into the Agreement and the Amendment.

48.     RE/MAX failed to provide certain marketing services and deliverables as required under the Agreement and the Amendment.

49.     Quicken Loans performed its obligations under the Agreement and/or the Amendment (or was excused from doing so).

50.     RE/MAX's failure to provide certain marketing services resulted in damages to Quicken Loans.   In addition, Quicken Loans has been required to retain the services of Greenberg Traurig, LLP and has agreed to pay Greenberg Traurig, LLP a reasonable fee. Because this is a suit for breach of contract, Quicken Loans is entitled to recover reasonable and necessary attorneys' fees that are equitable and just.

## PRAYER FOR RELIEF

WHEREFORE, Quicken Loans respectfully requests the following relief:

A.      That the Court award Plaintiff appropriate relief, to include actual and statutory damages, disgorgement, and restitution;

B.      That the Court award Plaintiff preliminary or other equitable or declaratory relief as may be appropriate by way of applicable state or federal law;

C.      That the Court impose exemplary and/or punitive damages under any provision of law under which exemplary and/or punitive damages may be imposed;

D.      That the Court award Plaintiff such other, favorable relief as may be available and appropriate under law or at equity;

E.      That the Court award costs and reasonable attorneys' fees; and

2:16-cv-13233-DML-RSW   Doc # 1   Filed 09/07/16   Pg 11 of 11   Pg ID 11

F.     That the Court enter such other and further relief as the Court may deem just and proper.

<u>**Jury Trial Demanded**</u>

Pursuant to Federal Rule 38(b), Quicken Loans hereby demands a trial by jury on all issues so triable that are raised by this Complaint.


Respectfully submitted,


/s/ Jeffrey B. Morganroth
Jeffrey B. Morganroth
**Morganroth & Morganroth, PLLC**
344 North Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
248.864.4000 – telephone
248.864.4001 – facsimile
jmorganroth@morganrothlaw.com
P41670


/s/ Membership Application To Be Submitted
Peter S. Wahby
**Greenberg Traurig LLP**
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
214.665.3600 – telephone
214.665.3601 – facsimile
wahbyp@gtlaw.com
Texas Bar No. 24011171

**ATTORNEYS FOR PLAINTIFF
QUICKEN LOANS INC.**